# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

DEBRA SMEGELSKY,              )      CASE NO. 5:17CV2700

                        )

          Plaintiff,        )

                        )

          v.               )      MAGISTRATE JUDGE

                        )      JONATHAN D. GREENBERG

NANCY A. BERRYHILL,        )

          Acting Commissioner   )

          of Social Security,     )      **MEMORANDUM OF OPINION**

                        )      **AND ORDER**

          Defendant.      )

Plaintiff, Debra Smegelsky ("Plaintiff" or "Smegelsky"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying her application for a Period of Disability ("POD") and Disability Insurance Benefits

("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.*

("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the

parties, pursuant to 28 U.S.C. § 636(c)(2). For the reasons set forth below, the Commissioner's

final decision is AFFIRMED.

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social Security.

1

# I.   PROCEDURAL HISTORY

In July 2014, Smegelsky filed an application for POD and DIB, alleging a disability onset date of October 24, 2012 and claiming she was disabled due to bilateral knee replacements, lower limb bilateral lymphedema, and numbness in her right foot and ankle. (Transcript ("Tr.") at 11, 158-159, 177.) The application was denied initially and upon reconsideration, and Smegelsky requested a hearing before an administrative law judge ("ALJ"). (Tr. 11, 104-107, 111-118.)

On December 8, 2016, an ALJ held a hearing, during which Smegelsky represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 27-78.) On January 12, 2017, the ALJ issued a written decision finding Plaintiff was not disabled. (Tr. 11-22.) The ALJ' s decision became final on November 1, 2017, when the Appeals Council declined further review. (Tr. 1-5.)

On December 28, 2017, Smegelsky filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 13, 15.) Smegelsky asserts the following assignment of error:

> (1)   The ALJ erred at Step Four of the Sequential Evaluation in finding
> Plaintiff capable of performing her past relevant work.

(Doc. No. 13 at 7.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Smegelsky was born in April 1955 and was sixty-one (61) years-old at the time of her administrative hearing, making her a "person of advanced age" under social security regulations. (Tr. 158.) *See* 20 C.F.R. §§ 404.1563(e) & 416.963(e). She has a college education and is able

to communicate in English.  (Tr. 176, 178.)  She has past relevant work as an office manager,

clerk of courts, and branch manager.  (Tr. 21.)

**B.**     **Relevant Medical Evidence[2]**

The record reflects Smegelsky underwent right knee replacement surgery on October 27,

2010, due to longstanding complaints of pain, decreased mobility, and difficulty with daily

activities.  (Tr. 473-476.)  In the months that followed, Smegelsky continued to complain of

pain, stiffness, and "clicking" in her right knee.  (Tr. 367, 366, 364, 362.)  She was advised to

rest, use ice, elevate her legs, and decrease her activity.  (*Id.*)  In addition, Smegelsky

occasionally underwent an injection in, or had fluid aspirated from, her right knee.  (*Id.*)

By the end of 2011, Smegelsky began complaining of pain and stiffness in her left knee

as well.  (Tr. 360.)  Examination in October 2011 revealed tenderness and reduced strength, but

no edema.  (*Id.*)  In December 2011, Smegelsky complained of pain, weakness, swelling, and

limping.  (Tr. 359.)  She also stated her right knee was locking and giving away.  (*Id.*)

Examination revealed 1+ effusion and tenderness.  (*Id.*)  She underwent an injection and

aspiration in her left knee.  (*Id.*)  Her surgeon, Joseph Blanda, M.D., indicated a possible need

for a left knee replacement the following year.  (*Id.*)

Smegelsky's left knee pain continued to worsen.  In April 2012, she complained of left

knee pain which she rated a 9 to 10 on a scale of 10.  (Tr. 356.)  Several months later, in July

2012, Smegelsky complained of left knee pain that was worsened with walking and kneeling.

(Tr. 355.)  She underwent a left knee injection.  (*Id.*)

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is
limited to the evidence cited in the parties' Briefs.

On October 25, 2012, Smegelsky underwent left knee replacement surgery with Dr. Blanda.  (Tr. 279-284.)  She was given a walker for ambulation after the surgery, and restricted from lifting anything over five pounds until cleared by her physicians.  (Tr. 323.)  Smegelsky returned to Dr. Blanda on November 8, 2012, reporting left knee pain and swelling.  (Tr. 352.)  Examination revealed normal sensation, normal reflexes, normal coordination, and no edema.  (*Id*.)

On May 22, 2013, Smegelsky presented for occupational therapy with Jennifer Martin, OTR.  (Tr. 259-261.)  She reported bilateral lower extremity edema (right worse than left) which worsened after her knee replacement surgeries.  (Tr. 259.)  Smegelsky stated she could not stand for long periods of time and had difficulty with steps and changing position from sitting to standing.  (*Id*.)  She also stated she "has her knees drained by ortho every 6 to 8 weeks, then has no difficulty for 10 days," but "after a period of time, edema becomes worse and she is unable to climb her steps."  (*Id.*)  Ms. Martin found Smegelsky presented with mild bilateral lower extremity lymphedema "of a pitting nature."  (Tr. 261.)  She recommended rehabilitative therapy twice per week for four weeks.  (*Id.*)  In addition, Smegelsky was prescribed compression stockings, as well as a compression pump for home use "with [bilateral lower extremity] boots/attachments/hose, to be used 1 x day for 1 hour."  (Tr. 256, 242, 261.)

Smegelsky's primary care physician, Ahurag W. Kedia, M.D., diagnosed her with chronic intractable lymphedema on June 27, 2013.  (Tr. 257.)  He explained as follows:

> Debra Ann Smegelsky is a 58-year old woman with chronic intractable lymphedema (457.1) of her bilateral lower extremities.  She has symptoms consisting of persistent swelling and edema.  She has functional [limitations] due to her lymphedema.  Some of the limitations include decreased range of motion, limited mobility, and pain.

I ordered a home compression pump for Mrs. Smegelsky in order to treat her chronic lymphedema. I ordered the pump after the following conservative remedies showed no improvement in reducing her limb girth: elevation, compression wrappings, exercise, and diuretics.

(*Id.*) Dr. Kedia stated that "without [the compression pump], she is at great risk for continued edema, infection, and/or prolonged hospitalization. She will need the equipment for the remainder of her life as a result of the chronic nature of her condition." (*Id.*)

Smegelsky returned to Dr. Blanda in March and April 2013. (Tr. 349, 348.) On March 14, 2013, she complained of swelling in her bilateral knees and stiffness in her right knee. (Tr. 349.) She rated the severity of her left knee symptoms a 0 on a scale of 10. (*Id.*) On April 4, 2013, Smegelsky complained of left knee swelling with walking and standing, and right knee pain. (Tr. 348.) On examination, Dr. Blanda noted 1+ effusion, no edema, and normal sensation, coordination and reflexes. (*Id.*) He administered an injection and aspirated fluid from Smegelsky's left knee. (*Id.*)

Smegelsky returned to occupational therapist Martin on June 17, 2013 and July 1, 2013. (Tr. 448-449, 442-446.) On July 1, 2013 (her sixth visit), she reported "some progress" towards edema reduction, noting an improvement both "in the way that her legs feel" and in her walking and standing tolerance. (Tr. 443.)

On September 26, 2013, Smegelsky returned to Dr. Blanda. (Tr. 346.) She complained of bilateral knee pain and swelling, as well as "clicking" in her right knee. (*Id.*) Smegelsky rated her right knee pain a 2 on a scale of 10, and her left knee pain a 0 on a scale of 10. (*Id.*) On examination, Dr. Blanda noted no edema and normal sensation, reflexes, and coordination. (*Id.*) He advised rest, ice, elevation, and decreased activity. (*Id.*)

On July 24, 2014, Dr. Blanda wrote a letter, indicating he had evaluated Smegelsky for lateral foot dysthesia. (Tr. 441.) He stated he believed she suffered from lumbar radiculopathy "from her chronic lumbar problems." (*Id*.) Dr. Blanda did not believe an EMG was necessary at that time and advised Smegelsky to "do more core training so her back pain does not worsen." (*Id*.) He also noted "she seems to be doing fairly well with her knees, even though she does have some problems with the right knee." (*Id*.)

Smegelsky presented to Dr. Kedia on July 17, 2014. (Tr. 483-485.) She complained of right foot numbness and tenderness, as well as right leg swelling. (Tr. 483.) Examination findings were largely normal, including no edema. (*Id*.) Dr. Kedia prescribed Lasix for Smegelsky's edema. (Tr. 484.) On October 22, 2014, Smegelsky returned to Dr. Kedia with no new complaints. (Tr. 479-481.) Examination findings again were normal, including no edema. (*Id*.)

On January 3, 2015, Smegelsky presented to Dr. Kedia with complaints of right knee swelling. (Tr. 535-536.) Examination revealed right knee tenderness and edema. (*Id.*) Later that month, Smegelsky complained of her right knee "giving out" and pain radiating down the back of her right leg. (Tr. 572.) Physical examination findings were normal, including no pedal edema. (*Id.*) Dr. Kedia continued Smegelsky on her Gabapentin. (Tr. 573.) Several weeks later, on January 28, 2015, Smegelsky indicated she was "doing okay" but her knee was "still bothering her." (Tr. 532.) Examination findings were again normal. (Tr. 533.)

On April 24, 2015, Smegelsky began treatment with Ali Bagheri, M.D., for treatment of lower back pain. (Tr. 592-594.) She reported a "popping" sensation and "generalized achiness" in her lower back. (Tr. 592.) Smegelsky also reported chronic lymphedema in her bilateral legs

and occasional numbness and tingling in her feet. (*Id.*) The "main portion of her pain," however, was in her lower back, particularly with prolonged standing and walking. (*Id.*) Smegelsky indicated this pain ranged from a 2 to a 5 on a scale of 10. (*Id.*) On lumbar examination, Dr. Bagheri noted no tenderness to palpation, normal active and passive range of motion, normal sensation and reflexes, and negative Babinski's. (Tr. 593.) He also reported "severe bilateral lower extremity lymphedema." (*Id.*) Dr. Bagheri assessed lumbar spondylosis and prescribed physical therapy and anti-inflammatories. (*Id.*)

On that same date, Smegelsky underwent a lumbar x-ray, which Dr. Bagheri interpreted as showing severe degenerative disc disease at L4-L5 and L5-S1 and moderate degenerative disc disease at L1 and L3. (Tr. 594.)

On April 24, 2015, Smegelsky completed a questionnaire in advance of physical therapy. (Tr. 551-552.) She reported an inability to walk and stand due to her conditions. (*Id.*) Smegelsky indicated her pain ranged from a 3 to an 8 on a scale of 10. (*Id.*) She also stated that, on a scale of 0 to 10, her "current activity level" was between a 5 and 6. (*Id.*)

On May 4, 2015, Smegelsky underwent an initial physical therapy evaluation with Shelley Krampf, P.T. (Tr. 548-550, 555.) Smegelsky reported her symptoms as follows:

> She has had a history of back pain and leg pain for years. She has been diagnosed with 3 herniated disks many years ago and was given stretches, which helped somewhat. Her pain has increased in the past 6 months to a year. She has pain across her low back and legs, which increases with prolonged standing and prolonged walking. She also has trouble due to bilateral knee replacement. Her right side was done in 2010. Her left side was done in 2012. Her left side has recovered well. Her right side has not recovered well. She also has bilateral lower extremity lymphedema. She feels that the way she walks affects her back. Her pain level currently in a seated position is a 1/10 to 2/10, and it increases up to 9/10 to 10/10 at worst. She takes Norco to reduce her pain. She uses heat and must change position often in order to reduce her symptoms. She has increased pain at night, which seems to be positional.

7

(Tr. 549.)  On examination, Ms. Krampf noted "visible and palpable lower extremity edema." (*Id.*)  She also found tenderness to palpation to her lower right paraspinal musculature, grossly normal lower extremity strength, normal lower extremity reflexes, and negative bilateral seated straight leg raise.  (*Id.*)  Ms. Krampf recommended aquatic-based physical therapy 2 to 3 times per week for 3 weeks.  (Tr. 550.)

The record reflects Smegelsky attended six physical therapy sessions in May 2015.  (Tr. 554-560.)  On May 6, 2015, Smegelsky reported she is only able to walk 200 feet before needing to sit down due to knee pain.  (Tr. 560.)  She rated her pain on that date a 2 to 3 out of 10.  (*Id.*)  On May 8, 2015, Smegelsky reported increased pain after her first session," stating "my back and legs were killing me."  (*Id.*)  She rated her pain a 2 on a scale of 10.  (*Id.*)  On May 11, 2015, Smegelsky again complained of increased pain, rating it a 3 on a scale of 10.  (Tr. 559.)   On May 15, 2015, she stated her pain was a 6 out of 10 (even with pain medication) and stated she "couldn't walk yesterday."  (Tr. 558.)  Smegelsky was back to her "usual 2" out of 10 on May 19, 2015.  (*Id.*)  On May 20, 2015, she stated she was "miserable yesterday" and rated her pain a 7 on a scale of 10.  (Tr. 557.)  On June 1, 2015, Smegelsky was discharged to Phase II of aquatic therapy.  (Tr. 554.)  Therapist Krampf indicated Smegelsky was "not interested in land PT." (*Id.*)

Meanwhile, on May 18, 2015, Smegelsky presented to orthopedist Michele Hatherill, M.D.  (Tr. 584-587.)  Smegelsky complained of constant, persistent bilateral knee pain; swelling in her lower extremities; and numbness and paresthesias in her feet and ankles.  (Tr. 586.)  She rated her pain a 3 to 4 on a scale of 10.  (*Id.*)  On examination, Dr. Hatherill noted normal gait, range of motion of Smegelsky's knees "from full extension to 115 degrees of flexion" with no

laxity, edema in both lower extremities, and full painless range of motion in her hips. (*Id.*) Dr. Hatherill concluded that Smegelsky had no evidence of malalignment or instability in either knee but did have symptoms consistent with possible neuropathy. (Tr. 587.) She further assessed chronic lymphedema in both legs of "questionable etiology." (*Id.*) She "strongly recommended that the patient continue an exercise program for lower extremity range of motion and strengthening," as well as weight reduction. (*Id.*) Dr. Hatherill did not believe Smegelsky would benefit from any surgical intervention at that time but recommended a neurological consultation to rule out neuropathy. (*Id.*)

Smegelsky returned to Dr. Bagheri on June 12, 2015. (Tr. 591.) She reported continued severe back pain as well as "some generalized bilateral lower extremity fatigue." (*Id.*) Dr. Bagheri noted Smegelsky "does not seem to be improving with physical therapy currently." (*Id.*) On lumbar spine examination, Dr. Bagheri noted no tenderness to palpation, normal active and passive range of motion, intact sensation, normal reflexes, and negative Babinski's. (*Id.*) He also found severe bilateral lymphedema in her lower extremities. (*Id.*) Dr. Bagheri assessed lumbar spondylosis and ordered an MRI of her lumbar spine. (*Id.*)

Smegelsky underwent the MRI on July 9, 2015. (Tr. 542-543.) It revealed (1) miminal degenerative spondylosis at L4-L5; (2) mild central canal stenosis due to facet joint hypertrophy at L3-L4; (3) mild central canal stenosis due to facet joint hypertrophy and minimal spondylolisthesis at L4-L5; and (4) minimal multi-level degenerative neural foraminal narrowing. (Tr. 543.)

On July 16, 2015, Smegelsky presented to neurologist Deren Huang, M.D., for evaluation of her foot neuropathy and lower back pain. (Tr. 615-617.) She reported that "for the last 6

months to 1 year, her feet have numbness and tingling zing-like sensation." (Tr. 615.) Smegelsky stated the numbness was constant and the tingling was intermittent. (*Id*.) She also reported aching pain, low back pain, and difficulty in long distance walking. (*Id*.) On examination, Dr. Huang noted normal muscle bulk, tone, and strength; normal sensation; and 1+ reflexes in Smegelsky's biceps, triceps, knees, and ankles. (Tr. 616.) He also found Smegelsky was not able to perform toe walking. (*Id*.) Dr. Huang assessed paresthesia and pain in both feet, and ordered an EMG and nerve conduction study of her bilateral lower extremities. (Tr. 617.)

Smegelsky under the EMG and nerve conduction study on August 24, 2015. (Tr. 622-627.) These studies were "abnormal in the left and right leg and demonstrate evidence of a polyneuropathy that affects the motor fibers predominantly." (Tr. 623.)

On August 31, 2015, Smegelsky returned to Dr. Kedia with complaints of foot pain and swelling. (Tr. 576.) Examination findings were normal. (*Id*.) Dr. Kedia assessed peripheral neuropathy and prescribed pain cream. (*Id*.)

On September 23, 2015, Smegelsky presented to Dr. Huang with reports of continued numbness and "zizing sensation." (Tr. 609.) On examination, Dr. Huang noted normal motor strength, coordination, and gait. (Tr. 610.) He diagnosed neuropathy and paresthesia, and prescribed Gabapentin. (Tr. 611.)

Smegelsky returned to Dr. Huang on December 15, 2015. (Tr. 606-608.) She reported a 70-80% reduction of her symptoms with Neurontin. (Tr. 606.) Physical examination findings were normal. (Tr. 607.) Dr. Huang continued Smegelsky on her medication. (Tr. 608.)

On May 11, 2016 (after her closed period of disability ended on December 31, 2015), Smegelsky presented to orthopedist Jonathan Schaffer, M.D., for surgical consultation regarding

her bilateral knee pain and osteoarthritis.  (Tr. 632-642.)  She rated her pain an 8 on a scale of 10 and indicated it was constant but worse with activity, standing, walking, sitting, rising from a seated position, and lying down.  (Tr. 633.)  Smegelsky also stated she felt "some instability" and had particular difficulty with stairs.  (Tr. 635.)  On examination, Dr. Schaffer noted full range of motion, nonantalgic gait, no effusion, no crepitus, and fair strength.  (Tr. 635.)  He diagnosed mechanical failure of Smegelsky's right knee replacement surgery.  (Tr. 636.)  Dr. Schaffer did not recommend any further aspirations and stated Smegelsky "needs to optimize" certain issues (including her weight[3] and her lymphedema) before revision surgery could be undertaken.  (Tr. 636.)

On July 28, 2016, Smegelsky returned to Dr. Huang.  (Tr. 602-604.)  She reported Neurontin "worked some [of the] time but not others," and complained that "there were times when her foot discomfort was severe."  (Tr. 602.)  Physical examination findings were largely normal, including normal motor and muscle strength, normal muscle bulk and tone, and normal gait and station. (Tr. 603.)  Dr. Huang did, however, note reduced sensation to pin prick and temperature.  (*Id*.)  He diagnosed idiopathic polyneuropathy, and prescribed Gabapentin and Neurontin. (*Id*.)

Smegelsky presented to Dr. Kedia on September 16, 2016.  (Tr. 596-597.)  She stated she had recently fallen when her knee "gave out," and complained of right knee pain and swelling. (Tr. 596.)  On examination, Dr. Kedia noted a contusion on Smegelsky's right knee and tibia, and ordered x-rays.  (*Id*.)

---

[3] At the time of this appointment, Smegelsky weighed 310 pounds and had a BMI of 44.48.  (Tr. 632.)

Shortly thereafter, on September 29, 2016, Dr. Blanda completed a Physical Residual Functional Capacity Assessment. (Tr. 629-630.) He concluded Smegelsky could lift and carry less than 10 pounds both occasionally and frequently; stand/walk for less than 2 hours per work day; and sit less than 2 hours per work day. (Tr. 629.) Dr. Blanda also found Smegelsky needed the opportunity to shift positions at will from sitting or standing/walking. (*Id.*) He stated she could sit for 5 minutes before needing to change positions. (*Id.*) Dr. Blanda opined Smegelsky could frequently reach, handle, finger, and feel; and "less than occasionally" engage in pushing/pulling. (Tr. 630.) Finally, he found Smegelsky would be absent from work more than three times per month. (*Id.*) When asked to identify medical findings supporting his opinion, Dr. Blanda noted bilateral knee degenerative joint disease and effusion. (*Id.*)

## C.     State Agency Reports

On November 13, 2014, Smegelsky underwent a physical consultative examination with Yolanda Duncan, M.D. (Tr. 488-494.) On examination, Dr. Duncan noted full but painful range of motion of all four extremities, normal pulses, normal sensation, negative Romberg's and no difficulty grasping or manipulating objects bilaterally. (Tr. 494.) However, she also observed significant edema in Smegelsky's lower extremities; a slow and unsteady gait; inability to perform heel to shin walking; and absent deep tendon reflexes in her knees. (*Id.*) Dr. Duncan assessed bilateral knee arthritis, degenerative disc disease in the lumbar region, migraines, hypercholesterolemia, GERD, morbid obesity, and bilateral lymphedema. (*Id.*) Dr. Duncan found as follows:

> Based on these findings, the patient may have difficulty with work-related physical activity such as walking more than 200 feet, sitting more than 20 minutes, standing more than 20 minutes, or climbing more than a flight of stairs. Hearing and speech are normal. The patient should not have difficulty traveling or following

commands.  From my observation, should she receive benefits, she should be able to manage these in her own best interest.

(*Id.*)

On November 18, 2014, state agency physician Robert Wysokinski, M.D., reviewed Smegelsky's medical records and completed a Physical Residual Functional Capacity ("RFC") Assessment.  (Tr. 85-87.)  Dr. Wysokinski opined Smegelsky could lift and carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of 4 hours in an 8 hour workday; and sit for a total of about 6 hours in an 8 hour workday.  (*Id.*)  He concluded Smegelsky could never crawl or climb ladders, ropes or scaffolds and occasionally balance, stoop, crouch, and climb ramps/stairs.  (*Id.*)  Dr. Wysokinski found Smegelsky had an unlimited capacity to push and pull and no manipulative limitations.  (*Id.*)  Lastly, he opined Smegelsky should avoid concentrated exposure to vibration and avoid all exposure to hazards such as unprotected heights.  (*Id.*)

On March 18, 2015, state agency physician Michael Delphia, M.D., reviewed Smegelsky's medical records and completed a Physical RFC Assessment.  (Tr. 98-100.)  Dr. Delphia reached the same conclusions as Dr. Wysokinski.  (*Id.*)

**D.  Hearing Testimony**

At the beginning of the December 8, 2016 hearing, Smegelsky's counsel acknowledged that Smegelsky had been engaging in substantial gainful activity as of January 2016 and indicated she was, therefore, seeking a closed period of disability from October 24, 2012 through December 31, 2015.  (Tr. 31.)  During the hearing, Smegelsky testified to the following:

- She lives with her spouse and father in a farmhouse.  (Tr. 33-34.)  She has a driver's license and drives.  (Tr. 34.)  She has a four year college degree in technical business.  (*Id.*)

13

- She is a veteran.  (Tr. 35.)  She was in the Navy from June 1975 until 1986 or 1987.  (*Id.*)  She served as a cryptologic technician.  (*Id.*)  She was honorably discharged.  (*Id.*)

- She has work experience as a clerk of courts, office manager, branch manager, and customer service representative.  (Tr. 37-47.)  In the first three of these jobs, she did not lift more than 20 pounds and was seated for most of the workday.  (*Id.*)  In the customer service representative position, she sometimes lifted up to 50 pounds and was on her feet for part of the day.  (Tr. 45-47.)  She stopped working in October 2012, after her second knee replacement surgery.  (Tr. 36.)  She could no longer work because she of "too many medical problems [and] too much time in [physical] therapy." (Tr. 37.)

- Several years later, in November 2015, she began working eight hours per week at HofbrauHaus doing accounting work.  (Tr. 49.)  In January 2016, her hours increased.  She began working three to four days per week for six to eight hours per day, i.e., approximately 20 hours per week.  (Tr. 49, 65.)  Her employer is very accommodating regarding allowing her to move around and elevate her legs as necessary.  (Tr. 65-66.)

- She has had two total knee replacement surgeries.  (Tr. 55-56.)  In October 2010, she had a right knee replacement.  (*Id.*)  Two years later, in October 2012, she had a left knee replacement.  (*Id.*) After the surgery on her left knee, her right knee was "overtaxed" and began "giving her issues." (Tr. 51, 56.)  As a result of her surgeries, she also developed lymphedema in her legs and neuropathy in her feet.  (Tr. 52-53.)  She was required to attend physical and aquatic therapy for both knees during the relevant time period.  (Tr. 56-57.)

- She wears compression stockings and uses a compression pump for her lymphedema.  (Tr. 53.)  She was prescribed the compression pump in May 2013.  (Tr. 57-58.)  She was told to use the compression pump for two hours per day, and to elevate her legs above the level of her heart as much as possible.  (Tr. 53, 57-58, 68.)  She was prescribed pain medication for her neuropathy.  (Tr. 55, 59.)  In addition, her doctor prescribed a cane in 2010 because her right knee "gives out on her." (Tr. 63.)  She uses ice every two to three days, and has a TENS unit.  (Tr. 65, 67.)

- During the relevant time period (i.e., October 2012 through December 2015), she participated in physical therapy for three to four months for her left knee and was in "ongoing" physical therapy for her right knee.  (Tr. 56.)  She was in therapy five days per week.  (Tr. 56.)  Physical therapy sessions were two hours per day, and water therapy was one to one and a half hours per day.  (Tr. 56-57, 61.)  Insurance eventually stopped paying for her therapy.  (Tr. 59-60.)

14

- On a typical day during the relevant time period, she used the compression pump for two hours, went to physical therapy, and then went to water therapy. (Tr. 60.) "If [she] wasn't in bed or in therapy, [she] was in a recliner with her feet up." (Tr. 64.) Compression, therapy, and elevation — "that was [her] life." (Tr. 70.)

- She can do laundry and cook. (Tr. 61-62.) Her husband does the grocery shopping. (Tr. 62.) She can go up and down stairs but only if she takes one step at a time and holds onto both handrails. (Tr. 61.) She cannot ride the tractor to mow the grass because the vibration hurts her knees. (Tr. 62.) She can stand long enough to peel a potato. (Tr. 62.) She can sit but, if her legs are not elevated above her heart, her lymphedema is "ridiculous." (Tr. 64.) She always needs to be in a reclined position. (*Id*.)

The VE testified Smegelsky had past work as a clerk of courts (sedentary, skilled, SVP 6); branch manager (sedentary, highly skilled, SVP 8); customer service representative (light performed as medium, semi-skilled, SVP 3); office manager (sedentary performed as light, skilled, SVP 7). (Tr. 71-72.) The ALJ then posed the following hypothetical question:

Assume a hypothetical individual of the claimant's age and education with the past jobs you described, and the one, the office manager, that she's performing [now]. * * *

Further assume that the individual can occasionally lift and carry 20 pounds, frequently lift and/or carry ten pounds; can stand and/or walk with normal breaks for a total of four hours, and sit with normal breaks for a total of six hours in an eight-hour workday; can occasionally climb ramps and stairs; never climb ladders, ropes, and scaffolds; can occasionally balance, stoop, kneel, and crouch, and never crawl. Must avoid concentrated exposure to vibration, and avoid exposure to moving mechanical parts, and unprotected heights.

Can the hypothetical individual perform any of the past jobs you described as actually performed, or generally performed in the national economy?

(Tr. 73.)

The VE testified the hypothetical individual would be able to perform Smegelsky's past work as a clerk of courts and branch manager, both as actually and generally performed. (Tr. 74.) The VE further explained the hypothetical individual would also be able to perform

Smegelsky's past work as an office manager as generally performed at the sedentary level, but not as actually performed at the light level. (Tr. 74-75.)

The ALJ then asked the VE regarding employer tolerance for off-task behavior and absences. (Tr. 75.) With regard to off-task time, the VE testified: "If the off task is one to ten percent inclusive, there is no issue, but if it rises to the level of equal to or greater than 20 percent, of course, both of these are in a day, there's no work, and the understanding is this is not a outlier type of situation, but a chronic off task issue . . . on average over time." (*Id*.) With regard to absences, the VE testified there would be no work for an individual who is absent two or more days per month. (Tr. 76.)

The ALJ then asked "if you had to elevate your legs above your heart level while you were working, would there be any work?" (Tr. 76.) The VE testified there would be no work for such a hypothetical individual. (*Id*.) Lastly, the ALJ asked whether the use of a cane for ambulation would effect the VE's testimony. (*Id*.) The VE testified the use of a cane would only exclude light work and, therefore, would not effect the hypothetical individual's ability to perform Smegelsky's sedentary past work as a clerk of courts, branch manager, and office manager (as generally performed). (*Id.*)

Smegelsky's counsel then asked whether there would be work available for a hypothetical individual that needed to use a compression pump on her legs for two hours per day. (Tr. 76.) The VE testified there would be no work for such an individual. (Tr. 77.)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason

of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her

past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Smegelsky was insured on her alleged disability onset date, October 24, 2012 and remained insured through her December 31, 2017, her date last insured ("DLI.") (Tr. 11.) The record reflects Smegelsky sought a closed period of disability between October 24, 2012 and December 31, 2015. Therefore, in order to be entitled to POD and DIB, Smegelsky must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2017.

2.   The claimant engaged in substantial gainful activity from January 2016 to the present (20 CFR 404.1520(b) and 404.1571 et seq.)

3.   However, there has been a continuous 12-month period(s) during which the claimant did not engage in substantial gainful activity. The remaining findings address the period(s) the claimant did not engage in substantial gainful activity.

4.   The claimant has the following severe impairments: osteoarthritis; history of bilateral total knee replacements; bilateral lower extremity lymphedema; degenerative disc disease of the lumbar spine; peripheral neuropathy; and morbid obesity (20 CFR 404.1520(c)).

5.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526.)

6.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a range of sedentary work as defined in 20 CFR 404.1567(a). Specifically, the claimant can lift and carry up to twenty pounds occasionally and ten pounds frequently. She can stand and/or walk for a total of four hours in an eight-hour workday and sit for six hours. She requires a cane for ambulation. The claimant can occasionally climb stairs or ramps, but never ladders, ropes or scaffolds. She can occasionally balance, stoop, kneel and crouch, but never crawl. The claimant must avoid concentrated exposure to vibration and all exposure to moving mechanical parts and unprotected heights.

7.  The claimant is capable of performing past relevant work as an office manager as defined by the Dictionary of Occupational Titles (DOT) at 169.167-034; clerk of courts, DOT 243.362-010 and; branch manager, DOT 183.117-010. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

8.  The claimant has not been under a disability, as defined in the Social Security Act, from October 24, 2012, through the date of this decision (20 CFR 404.1520(f)).

(Tr. 11-22.)

## V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are

19

supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

*Credibility*

In her sole assignment of error, Smegelsky argues the ALJ erred in evaluating her credibility, asserting the reasons given by the ALJ for discounting the severity of her symptoms are "wholly inconsistent with the evidence." (Doc. No. 13 at 8, 10.) Specifically, she maintains the ALJ's statement that she received "generally conservative treatment" is belied by the record, including evidence she had two total knee replacement surgeries and was prescribed both a compression pump and compression stockings. (*Id.* at 10-11.) Next, Smegelsky takes issue with the ALJ's statements that her treating physicians did not observe significant lower extremity edema or expressly order her to elevate her legs above her heart. (*Id.* at 11-13.) She also objects to the ALJ's characterization of the nature and extent of her physical therapy, as well as the ALJ's failure to recognize that her condition "has been resistant to multiple modalities of treatment and continues to cause chronic and unremitting swelling resulting in both pain and

significant discomfort in her lower extremities." (*Id*. at 12.) Finally, Smegelsky argues the ALJ

erred in rejecting her statements that she needs to use her compression pump for two hours per

day and frequently elevate her legs. (*Id*. at 13.)

The Commissioner argues the ALJ properly evaluated Smegelsky's credibility. (Doc.

No. 15 at 6-11.) She first notes the ALJ made only a "partially adverse credibility finding,"

arguing a sedentary RFC "represents a significantly restricted range of work." (*Id*. at 8.) In this

regard, the Commissioner argues that "although the ALJ did not give full credit to Plaintiff's

allegations, the ALJ did factor those complaints into the RFC finding rather than rejecting them

outright." (*Id*.) She then asserts the record does not support Smegelsky's argument that her

symptoms are of disabling severity, noting the numerous normal clinical examination findings in

the record and the fact she was able to return to substantial gainful work activity in January 2016

despite the lack of any "intervening event" that improved her condition enough to return to work.

(*Id*.) The Commissioner also notes Smegelsky's two knee replacement surgeries occurred prior

to her closed period of disability and, further, that her doctors only required her to use the

compression pump for one (rather than two) hours per day. (*Id*. at 9.) Finally, with regard to

Smegelsky's physical therapy, the Commissioner argues that, during the relevant time period,

she attended therapy sporadically and, in fact, did not attend any therapy sessions at all between

August 2013 and May 2015. (*Id*.)

It is well settled that pain alone, if caused by a medical impairment, may be severe

enough to constitute a disability. *See Kirk v. Sec' of Health and Human Servs.*, 667 F.2d 524,

538 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). When

a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for

evaluating these symptoms.  *See e.g, Massey v. Comm'r of Soc. Sec.*, 2011 WL 383254 at * 3

(6th Cir. Feb. 7, 2011).  First, the ALJ must determine if there is an underlying medically

determinable physical or mental impairment that could reasonably be expected to produce a

claimant's symptoms.  Second, the ALJ "must evaluate the intensity and persistence of [the

claimant's] symptoms so that [the ALJ] can determine how [those] symptoms limit [the

claimant's] capacity for work."  20 C.F.R. § 404.1529(c)(1).  *See also* SSR 16-3p,[4] 2016 WL

1119029 (March 16, 2016).  Essentially, the same test applies where the alleged symptom is

pain, as the Commissioner must (1) examine whether the objective medical evidence supports a

finding of an underlying medical condition; and, if so, (2) whether the objective medical

evidence confirms the alleged severity of pain arising from the condition or whether the

objectively established medical condition is of such a severity that it can reasonably be expected

to produce the alleged disabling pain.  *Duncan v. Secretary of Health & Human Services*, 801

F.2d 847, 853 (6th Cir. 1986).  *See also Felisky v. Bowen*, 35 F.3d 1027, 1038–39 (6th Cir.

1994); *Pasco v. Comm'r of Soc. Sec.*, 137 Fed. Appx. 828, 834 (6th Cir. June 2005).

     If these claims are not substantiated by the medical record, the ALJ must make a

credibility[5] determination of the individual's statements based on the entire case record.

------

[4]      SSR 16-3p superceded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016.  Thus, SSR 16-3p was in effect at the time of Smegelsky's December 8, 2016 hearing.

[5]      SSR 16-3p has removed the term "credibility" from the analysis.  Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence."  SSR 16-3p, 2016 WL 1119029 at *6.  The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's

23

Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) ("noting that "credibility determinations regarding subjective complaints rest with the ALJ").  The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987).  Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms"  SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 16-3p, 2016 WL 1119029.  Beyond medical evidence, there are seven factors that the ALJ should consider.[6]  The ALJ need not analyze all seven

character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016).

[6]     The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D.

factors, but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ determined at step two that Smegelsky suffered from the severe impairments of osteoarthritis, history of bilateral total knee replacements, bilateral lower extremity lymphedema, degenerative disc disease of the lumbar spine, peripheral neuropathy, and morbid obesity. (Tr. 13.) After finding Smegelsky's impairments did not meet or equal the requirements of a listing, the ALJ proceeded at step four to consider Smegelsky's subjective complaints as well as the medical and opinion evidence regarding her impairments. (Tr. 14-21.) The ALJ first acknowledged Smegelsky's complaints of lower extremity lymphedema, numbness, constant tingling, pain and swelling, and more frequent "giving out" of her right knee. (Tr. 15.) The decision also recognized Smegelsky's statement that "her ability to work was limited due to her participation in physical therapy following her second knee replacement surgery," taking particular note of her allegation that she participated in aquatic therapy five days per week for sixty to ninety minutes per day from October 2012 through January 2016. (*Id*.) The ALJ also noted Smegelsky's testimony that she is required to use a compression pump to alleviate her leg swelling and must elevate her legs throughout the day. (*Id*.)

The ALJ then found that "the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons

Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

explained in this decision." (Tr. 16.) The ALJ provided a number of reasons for discounting Smegelsky's allegations regarding the severity of her symptoms. First, the ALJ found Smegelsky's "generally conservative treatment since her most recent knee replacement surgery in October 2012 fails to support her allegations." (*Id.*) The decision noted that, after this surgery, Dr. Blanda observed "intermittent tenderness of the knees, without edema or deficits of coordination, deep tendon reflexes or sensation." (*Id.*) The ALJ further noted Dr. Blanda's post-surgical treatment was generally limited to rest, ice, compression and elevation and that Smegelsky did not return to Dr. Blanda for treatment for her knees after September 2013. (*Id.*)

Next, the ALJ found "the record does not contain observations of the claimant's treating physicians of significant edema affecting the lower extremities." (*Id.*) The decision also noted that "while the claimant testified that she must use [a] vasopneumatic compression pump for two hours per day, Dr. Kedia recommended the pump's use for only hour each day." (*Id.*)

The ALJ then concluded that "the claimant's testimony regarding the frequency of therapy sessions is also unsupported by the record." (*Id.*) Specifically, the ALJ found as follows:

> Dr. Kedia referred the claimant to a physical therapist for evaluation and treatment pursuant to a diagnosis of lymphedema. The claimant presented for initial evaluation by a physical therapist on May 22, 2013 and reported that she had always had edema of the right lower extremity and developed worsening edema of the left lower extremity following her knee replacement. A four-week course of twice-weekly physical therapy was recommended (3F/9, 11). However, approximately one month later, the claimant had attended only four physical therapy visits and reported no significant improvement (9F/13-14). By the time of a July 1, 2013, reevaluation, the claimant had still attended only six therapy sessions. Despite little reported progress, continued therapy was recommended at a decreased frequency of one visit per week for four weeks (9F/3-5).

There is no evidence of the claimant's participation in a formal physical therapy program between August 2013, ten months after the alleged onset of disability, and May 2015, when the claimant was referred to therapy due to complaints of low back pain (18F/5-6 and 15F/9). While the claimant testified that she participated in physical therapy on a daily basis for one hour each day with additional time for travel and preparation, there is no evidence that therapists recommended sessions more frequently than two to three times per week during the period for adjudication (15F/10, 9F/5 and 3F/11). The claimant attended six therapy sessions during a two-week period in May 2015 (15F/16), but previously saw a therapist less frequently than her treatment program prescribed (9F/3-5).

(Tr. 16-17.)

The ALJ then determined "since September 2013, when the claimant was last seen by Dr. Blanda, there is no documentary evidence that a physician recommend the claimant elevate her legs" and "no indication whatsoever that any physician advised the claimant to elevate her legs above the level of her heart or that she continue to elevate her legs throughout the day." (Tr. 17.) The ALJ went on to note Dr. Hatherill's normal physical examination findings in May 2015, as well as Dr. Bagheri's normal spinal examination findings during that same time period. (Tr. 17-18.)

Lastly, with regard to Smegelsky's neuropathy, the ALJ noted her "positive response to treatment, sporadic treatment since her return to substantial gainful activity in January 2016, and the absence of clinical signs of neuropathy on physical examinations during the closed period does not support a finding of greater or additional functional limitations." (Tr. 19.)

The ALJ summarized her findings with respect to Smegelsky's bilateral lower extremity pain and swelling as follows:

The claimant's history of bilateral total knee replacement surgeries in October 2010 and October 2012 and ongoing, intermittent treatment for complaints of knee pain and lymphedema support the exertional and postural limitations set forth in the residual functional capacity. However, as detailed above, the claimant's treatment since October 2012 and the alleged onset of disability has

been conservative in nature. No treating physician recommended further surgical intervention during the requested closed period of disability prior to the claimant's January 2016 return to substantial gainful activity. She has not required the ongoing or regular treatment of an orthopedist or other specialist since September 2013, less than twelve months after the alleged onset of disability. She has not been prescribed regular or extended courses of narcotic-based pain medications. While the claimant has participated in multiple courses of physical therapy, the duration and intensity of this therapy as alleged by the claimant is inconsistent with treatment records.

(Tr. 18.)

Substantial evidence supports the ALJ's credibility analysis. As the ALJ correctly noted, during the relevant time period (October 24, 2012 through December 31, 2015), Smegelsky received generally conservative treatment for her lymphedema, knee and back pain, and neuropathy. In the months following her left knee surgery, Smegelsky was referred to physical therapy and prescribed anti-inflammatories and pain medication. By July 2013, she reported improvement to her orthopedist and knee surgeon, Dr. Blanda. (Tr. 443.) Smegelsky's last visit to Dr. Blanda for treatment of her knees was in September 2013, at which time physical examination findings were normal and she rated her right knee pain a 2 on a scale of 10 and her left knee pain a 0 on a scale of 10. (Tr. 346.) In July 2014, Smegelsky returned to Dr. Blanda for consultation regarding foot dysthesia. At that time, he recommended strength training and noted "she seems to be doing fairly well with her knees." (Tr. 441.) In May 2015, Dr. Hatherill evaluated Smegelsky's knees and "strongly recommended that [she] continue an exercise program for lower extremity range of motion and strengthening, as well as weight reduction." (Tr. 587.) She did not believe Smegelsky would benefit from any surgical intervention. (*Id.*) Indeed, Smegelsky has not cited to any treatment records suggesting that, during the relevant

time period, her physicians recommended surgical treatment for her continued knee and/or back pain.

Nonetheless, Smegelsky asserts she was prescribed a home compression pump and instructed to elevate her legs above her heart throughout the day, which she argues does not constitute conservative treatment. While it is true Smegelsky was prescribed a pump in May 2013, the ALJ correctly notes her physicians recommended she use it for one hour per day, rather than the two hours Smegelsky claimed during the hearing. (Tr. 256, 261.) Moreover, Smegelsky does not cite any evidence that her treating providers advised her she was required to use the compression pump during normal working hours. Additionally, with regard to her need to elevate her legs, Smegelsky fails to cite any treatment records indicating her physicians instructed her to elevate her legs above the level of her heart on a daily basis. In fact, as the Commissioner correctly notes, Smegelsky points to no treating physician opinion (or even treatment note) indicating the need for her to elevate her legs for the duration and frequency that she testified was necessary at the hearing.

Smegelsky also argues the ALJ's credibility analysis is flawed because it misstates the evidence regarding her physical therapy. This argument is without merit. As the ALJ correctly notes, Smegelsky's testimony that she attended physical therapy on a daily basis for one hour each day throughout the entire time period at issue, is not supported by the evidence in the record. As noted above, treatment records reflect Smegelsky participated in a total of six physical therapy sessions between May and July 2013. (Tr. 259-261, 448-449, 442-446, 452.) Smegelsky does not direct this Court's attention to any evidence, however, indicating she participated in any physical therapy between August 2013 and May 2015. Moreover, although

the record reflects Smegelsky participated in six physical therapy sessions in May 2015, she does not direct this Court's attention to any evidence that she participated in any physical therapy between June and December 2015.  As noted *supra*, Smegelsky's period of disability is between October 24, 2012 and December 31, 2015, comprising a total of 38 months.  There is no evidence Smegelsky participated in physical therapy for 27 of these 38 months; i.e. for the 21 month period between August 2013 and May 2015 and the 6 month period between June 2015 and December 2015. Thus, the ALJ did not err in discounting Smegelsky's hearing testimony that she could not work during the relevant time period because of the frequency and duration of her physical therapy sessions.

Finally, the Court notes that, while Smegelsky's treating providers did occasionally note effusion and/or edema in her bilateral lower legs, the medical records contains numerous normal physical examination findings.  As the ALJ notes, treatment notes frequently documented normal coordination, normal gait, normal sensation, normal reflexes, normal range of motion, negative Babinski's, normal lower extremity strength, normal muscle tone and bulk, and negative straight leg raise.  (Tr. 352, 348, 346, 483, 479-481, 572, 533, 593, 549, 586, 591, 616, 576, 610.) There are also numerous findings of no edema.  (Tr. 348, 352, 346, 479, 483, 533, 572, 576.)

While Smegelsky urges the Court to find that the reasons given by the ALJ do not demonstrate a lack of credibility, it is not this Court's role to "reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute its judgment for that of the ALJ." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011) (citing *Youghiogheny & Ohio Coal Co. v. Webb*, 49 F.3d 244, 246 (6th Cir. 1995)).  *See*

*also Vance v. Comm'r of Soc. Sec.*, 2008 WL 162942 at * 6 (6th Cir. Jan. 15, 2008) (stating that "it squarely is not the duty of the district court, nor this court, to re-weigh the evidence, resolve material conflicts in testimony, or assess credibility.")  The ALJ provided sufficiently specific reasons for her credibility determination and supported those reasons with reference to specific evidence in the record.  Smegelsky's argument to the contrary is without merit.

## VII.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**


  *s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: November 26, 2018